IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Civil No. 23-179 |
| | ) |
| RASHEE BEASLEY | ) |

**Opinion and Order**

Defendant Rashee Beasley is charged in a one-count Indictment with Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1). Presently before the Court is Defendant's Motion to Suppress Evidence. ECF No. 36. Mr. Beasley argues that the police conducted unlawful warrantless searches and seizures with respect to his cell phone, his rental vehicle, his arrest, and his residence. The government filed its Response, opposing the Motion, to which Mr. Beasley filed a Reply. ECF Nos. 40 & 43. A hearing was held on September 25, 2024, where Monroeville Police Department Detective Steven Maritz, Monroeville Police Department Detective James Monkelis, and digital forensic analyst Frederick Dyroff testified. ECF No. 48. For the reasons explained below, Mr. Beasley's Motion will be denied.

**I. Background**

*Reported Stolen Jeep*

On October 27, 2022, after he had completed his normal workday, Detective Steven Maritz of the Monroeville Police Department remained on the lookout for a stolen Jeep Cherokee Overland. Detective Maritz learned of the stolen Jeep by way of a Monroeville Police Department, "Be on the Lookout for" bulletin. Gov Ex. 4. The Bulletin noted that the license plate of the stolen Jeep was last recognized by a License Plate Reader in Monroeville, near Detective Maritz's patrol area. Detective Maritz, who was in plain clothes and driving an

unmarked vehicle, noticed a Jeep, that matched the description of the stolen Jeep, was parked on the lot of an Avis rental car business. Detective Maritz testified that this Avis location was known to law enforcement, because criminal activity had been occuring at this location.

### The Avis Lot

Detective Maritz entered the Avis lot, parked his car and walked over to the suspected stolen Jeep to see if its' license plate was a match for the reported stolen Jeep. As he walked towards the Jeep, Detective Maritz noticed a group of about ten men present on the lot, with one individual located close to the driver door of the Jeep. There was no indication that Detective Maritz was a police officer, though he did have his badge and gun on his waist, but neither were visible to the public. The Jeep was backed into a parking space, so he had to walk around it to read the license plate. Detective Maritz confirmed that the Jeep was the reported stolen Jeep. He then uncovered his badge and gun so that they were visible to the public, at which point the group of men began to run. Detective Maritz focused his attention on apprehending the individual who was closest to the Jeep's driver door, later identified as Lawrence Strothers. Mr. Strothers attempted to flee from Detective Maritz by jumping into the back seat of an open-top convertible Mustang parked approximately one-car length away from the stolen Jeep.

### Rented Mustang

Defendant Rashee Beasley was sitting in the driver's seat of that Mustang, when Mr. Strothers jumped into the back seat. Detective Maritz grabbed Mr. Strothers. stopping him from getting away. At the same time, Detective Maritz grabbed ahold of Mr. Beasley's hair to stop him from exiting the Mustang. At some point during the struggle with Mr. Strothers and Mr. Beasley, Detective Maritz shouted to the two men, "Police, stop!," or an equivalent announcement of his status, and ordered them to cease. In response, Mr. Beasley stated, "I don't

2

want any trouble." Mr. Beasley eventually broke free from Detective Maritz's grasp, jumped out of the passenger side of the Mustang, and then jumped into a moving car that drove off the Avis lot.

### *Search of the Jeep and the Mustang*

Detective Maritz arrested Mr. Strothers in connection with the stolen Jeep. One of the backup officers was able to look through the Jeep window and, in plain view, he saw an AR-15 type pistol plus several bricks of suspected heroin. The rented Mustang was also searched. Detective Maritz found Mr. Beasley's wallet and identification in the Mustang's center console. The key to the stolen Jeep, which Mr. Strothers dropped inside the Mustang during his struggle with Detective Maritz, was also recovered from the Mustang. Detective Maritz also found a cell phone on the ground outside the passenger side of the Mustang, within Mr. Beasley's flight path.

Mr. Beasley's driver's license confirmed his identity as the individual who had fled from the driver's seat. Detective Maritz testified that, based upon Mr. Beasley's flight path, he assumed the cell phone recovered from the ground outside the Mustang, belonged to Mr. Beasley. Detective Maritz also testified that the name, "Rashee Beasley," was familiar to him from an ongoing Title III criminal investigation into a large-scale illegal drug distribution operation, known as, "Hustlas Don't Sleep" (HDS). Detective Maritz had been working with federal law enforcement on the HDS investigation. His role was to monitor communications among members of HDS and to conduct limited surveillance. Through his work on the HDS investigation, Detective Maritz had learned that Rashee Beasley was a convicted felon, a suspected member of HDS, and was known to have had interactions with other felons that revealed his association with violent conduct. Later, Detective Maritz also obtained Mr. Beasley's criminal record, which confirmed his status as a convicted felon.

*Incoming Calls on the Cell Phone*

While in possession of Mr. Beasley's suspected cell phone, Detective Maritz answered between four and six incoming FaceTime calls. Detective Maritz did not believe he needed a search warrant to answer incoming calls. He did not impersonate Mr. Beasley; he engaged with the callers as himself. Detective Maritz also did not look at any internal data from the cell phone, as he knew that such an investigation of the internal contents of the phone required a search warrant. One of the answered incoming calls was from a landscaper, who was seeking payment for services performed for Mr. Beasley. From that call, Detective Maritz obtained an address where Mr. Beasley might be located, 410 Bellwood Avenue, Monroeville, Pennsylvania. Officers determined that 410 Bellwood Avenue was owned by a Limited Liability Company. The mailing address for property taxes for 410 Bellwood was identified as Mr. Beasley's address as shown on his driver's license.

*410 Bellwood Avenue*

Detective Maritz and several additional Monroeville Police officers then traveled to 410 Bellwood Avenue to search for and arrest Mr. Beasley. The arrest of Mr. Beasley was premised upon the facts Detective Maritz and his fellow officers knew at the time:

- That Mr. Beasley was connected to the HDS investigation (which involved numerous types of illicit drugs as well as firearms),
- Mr. Beasley and Mr. Strothers were suspected to be associated, and involved in criminal activity, based upon the fact that they were both near the stolen jeep, and because Mr. Beasley was in the driver's seat of the Mustang that Mr. Strothers jumped into as he attempted to flee,
- Both Mr. Beasley and Mr. Strothers attempted to flee, despite Detective Maritz' order, to stop,
- Mr. Beasley successfully fled from Detective Maritz, and
- an AR-15 style pistol and several bricks of heroin were recovered from inside the stolen Jeep.

The police officers thus approached the Bellwood Avenue residence prepared to encounter

resistance, possible weapons, and/or attempts to flee from whomever was inside.

When they arrived at 410 Bellwood Avenue, a BodyCam video shows several officers running towards the residence, while, at the same time, Mr. Beasley exited the front door and leaped over the deck into the yard. Mr. Beasley was immediately stopped, taken to the ground, and handcuffed. Mr. Beasley was searched, and $3,690 in United States currency was removed from his person. While he was detained on the ground, Mr. Beasley was asked if anyone else was inside the residence; however, he did not respond.

Shortly after Mr. Beasley was detained, a woman emerged from the 410 Bellwood residence. She possessed a loaded firearm, which was inside a pocket in her in sweatpants. She informed the officers that she possessed the firearm legally and that she had a license to carry it. She did not have identification on her; thus law enforcement could not readily confirm her statements or identity. Officers detained her until her identity could be confirmed. Once identified, the officers were able to verify that she legally possessed the firearm. She told officers that there was no one else inside the residence.

### *Protective Sweep*

At this point, Detective Maritz and the other Monroeville Police officers planned to apply for a search warrant, because the decided they had probable cause to search 410 Bellwood Avenue. Facts to support probable cause to search the residence include:

- the officers' knowledge that Mr. Beasley was sitting in the Mustang that Mr. Strothers jumped into, which indicated a relationship between them and the stolen Jeep;

- that several bricks of suspected heroin and a firearm were found in the stolen Jeep, which indicated drug trafficking;

- that Mr. Beasley fled from the Avis parking lot, despite Detective Maritz's order to stop;

- that Mr. Beasley was known as a suspect in the HDS drug trafficking investigation;

- that Mr. Beasley attempted to flee a second time when law enforcement arrived at the Bellwood Avenue residence; and

- that Mr. Beasley was in possession of $3,690 in cash, which suggested drug trafficking.

Before securing the residence in anticipation of a search warrant, the officers conducted a protective sweep, because they believed there was reasonable suspicion that a person, posing a danger to the officers and the public, could be inside the residence. During the protective sweep, officers located a loaded Glock handgun in plain view. Thereafter, Detective Maritz seized the loaded firearm and took it with him.

### *Search Warrant for 410 Bellwood Avenue*

An Affidavit of Probable Cause in support of an Application for a Search Warrant for the 410 Bellwood residence was prepared by Detective James Monkelis. Gov. Ex. 3. Detective Monkelis began the Affidavit by identifying the BOLO for the stolen Jeep, and reporting Detective Maritz's discovery of the Jeep inside the Avis parking lot. *Id.* at 3. Detective Monkelis stated that there were several young black males in the parking lot, and noted that Avis had closed for the day. *Id.* The Affidavit stated that the young men, in the area of the stolen Jeep, fled from Detective Maritz. *Id.* Detective Maritz was able to apprehend one individual, Mr. Strothers, who possessed the key to the stolen Jeep. *Id.*

Next, the Affidavit identified the rented convertible Mustang that was parked next to the Jeep with its top down. *Id.* Mr. Beasley was identified as the renter of the vehicle, and the Affidavit explains that Mr. Beasley was one of the young males who fled from the parking lot. *Id.* Detective Monkelis stated that Mr. Beasley had jumped into another vehicle and escaped. *Id.* Detective Monkelis also stated that Mr. Beasley had been convicted multiple times.

The Affidavit averred that Mr. Beasley had left his driver's license in the center console area of the Mustang. *Id.* The Affidavit described that, inside the stolen Jeep, law enforcement recovered "a fully loaded no brand built AR assault pistol with a thirty one round magazine of 556 ammunition and several bundles of suspected heroin (3 1/2 bricks)[,] which was approximately two hundred stamp bags," and "a knotted baggy of suspected crack cocaine with black rubber bands as packaging supplies." *Id.*

Detective Monkelis stated that Monroeville Police officers then traveled to 410 Bellwood Avenue, "a known BEASLEY location." *Id.* Upon arrival, Detective Monkelis and the other officers "walked up to the door of the residence [and] on approach Rashee BEASLEY exited the front door[,] jumped over an approximately three foot wooden deck fence[,] and attempted to flee from Police a second time but he was apprehend[ed] at gunpoint without incident." *Id.*

Next, Detective Monkelis stated that a female exited the 410 Bellwood Avenue and she was found to have a loaded handgun in the pocket of her sweatpants. *Id.* The female was detained at first, but then was released with her "registered firearm." *Id.* Detective Monkelis stated that the "residence was cleared for emergency/exigent circumstances and a second Glock loaded handgun was seized in plain view in the house." *Id.* The Affidavit noted that the female denied ownership of the Glock handgun. The Affidavit concluded that, "[b]ased on the criminal activity observed and what occurred at the residence of 410 Bellwood Avenue this is a search warrant for that property to seize firearms criminally possessed." *Id.*

The search warrant was approved, and a nighttime search was authorized in light of the fact that the residence was presently being secured by police officers. Gov. Ex. 3, at 1. Besides the initial handgun, which was viewed in plain sight during the protective sweep, the search of the residence did not yield any other items.

*Cell Phone Warrants*

As a result of the October 27, 2022 events, additional search warrants were obtained on November 22, 2022, authorizing searches of Mr. Beasley's cell phone that was found on the Avis parking lot outside the Mustang, plus two cell phones that were found inside the stolen Jeep. Gov. Ex. 2. With respect to Mr. Beasley's cell phone, law enforcement sought permission to search the phone for evidence of possession or knowledge of the stolen Jeep, evidence of possession of the Glock handgun found inside 410 Bellwood Avenue, evidence of drug trafficking, and evidence of ownership of the cell phone. Gov. Ex. 2, at 7, 9. An Affidavit of Probable Cause in support of the Application for a Search Warrant for Mr. Beasley's cell phone was prepared by Detective Maritz. Gov. Ex. 2, at 8-9. In his Affidavit, Detective Maritz provided a detailed recitation of the events that had occurred on October 27, 2022. The authorized search of the cell phone uncovered inculpatory evidence against Mr. Beasley.

## II.    Motion to Suppress Evidence

Mr. Beasley argues that all physical and electronic evidence, derived from the four warrantless searches and seizures, must be suppressed as unconstitutional under the Fourth Amendment. The warrantless searches and seizures at issue are the search and seizure of his cell phone, the search and seizure of his rented Mustang, his seizure by arrest outside the 410 Bellwood Avenue residence, and the protective search of 410 Bellwood Avenue. Mr. Beasley also argues that any derivative evidence obtained from the unconstitutional searches and seizures must be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). Thus, he argues that not only all direct evidence obtained from the above warrantless searches must be suppressed, but also that all evidence obtained from the subsequent searches of his cell phone and of 410 Bellwood Avenue, pursuant to authorized warrants, should be suppressed.

### A. Search of the Cell Phone

Mr. Beasley argues that Detective Maritz engaged in an unconstitutional warrantless search of his cell phone when he answered incoming calls. Mr. Beasley specifically challenges Detective Maritz's manipulation of the cell phone screen, arguing that information associated with, and obtained from, any incoming call displayed on the screen, was an unlawful search. Mr. Beasley's argument is "not that the police conversed with a third party, but that the police manipulated the phone and revealed information on that phone." Def. Reply 5, ECF No. 43. Mr. Beasley does not argue that he has a "privacy interest in the substance of a conversation between a law enforcement agent and a caller;" but rather, he argues that he "has a privacy interest in whether that conversation should occur in the first place." *United States v. De La Paz*, 43 F. Supp. 2d 370, 372 (S.D.N.Y. 1999) (noting a distinction between "the privacy interest invaded by a search alone [and the privacy] interest in whatever is uncovered by a search").

In response, the government argues: (i) that answering incoming calls to Mr. Beasley's cell phone did not constitute a search under the circumstances of this case, (ii) if answering calls is considered a search, there was still no violation of the Fourth Amendment, because Mr. Beasley abandoned his cell phone, and/or (iii) exigent circumstances existed that permitted Detective Maritz to answer incoming calls on the cell phone.

### 1. A Search of the Cell Phone did not Occur

The United States Supreme Court categorized modern cell phones as fundamentally different from other items that an individual may carry on their person. *Riley v. California*, 573 U.S. 373 (2014). In *Riley*, the Supreme Court held that law enforcement "must generally secure a warrant before conducting" a search of data on a cell phone. *Id.* at 386. The Supreme Court did not address the issue of whether an officer answering an incoming call constitutes a search.

The Court concludes that, under the circumstances of this case, Detective Maritz did not unlawfully search Mr. Beasley's phone by answering incoming calls.

The government points out that it is well-settled that an officer may lawfully answer incoming calls to a landline telephone embedded in a residence, where law enforcement's presence within the residence is legitimate. Gov. Br. 7 (citing *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1513–14 (6th Cir.1988); *United States v. Passarella*, 788 F.2d 377, 379–81 (6th Cir.1986); *United States v. Vadino*, 680 F.2d 1329, 1335 (11th Cir.1982); and *United States v. Kane*, 450 F.2d 77, 84–85 (5th Cir.1971). Similarly, where an officer is legitimately in possession of a cell phone dropped at the scene of a crime and observes, in plain view, an incoming call arriving on the cell phone, the officer may lawfully answer the incoming call without violating the Fourth Amendment. The only thing the officer does to answer the incoming call is to push a button or swipe the cell phone interface. There is no other consequence, such as reviewing data or scrolling the phone for information, from answering the call. Thus, an officer lawfully holding a cell phone who answers an incoming call does not access the kinds of cell phone information that the Supreme Court highlighted as making a cell phone fundamentally different from other items a person may carry. *See e.g.*, *Riley*, 573 U.S at 386, 393, 393-94, 394, 396-97, 400 (citing, in part, the cell phone's vast storage capacity and the immense amount of personal information stored on a cell phone). Detective Maritz did not access or try to access any of the data within the cell phone. Therefore, there was no search of the cell phone.

In the circumstances of this case, Detective Maritz was akin to an officer in a home who answers an incoming call on a landline phone. In both cases, the officer does no more than answer the phone. As with a cell phone, a landline phone also commonly has a caller ID display,

or an attached caller ID screen, that informs the answering party of the number (and perhaps name) of the incoming caller. Such information is indistinguishable from the information that is displayed on a cell phone screen with an incoming call. There is no logical reason to treat incoming caller information on a cell phone differently from incoming caller information on a landline caller ID display. In addition, an officer lawfully in possession of a cell phone may view the incoming caller's displayed information on the cell phone screen, as that information appears in plain view of the officer just like caller ID information on a landline phone. The Court sees no reason to conclude that an officer may lawfully view such information in plain view, but not answer the incoming call. Answering the incoming call then becomes a conversation with the incoming caller, unconnected to searching any cell phone data. Accordingly, the Court concludes that, in the circumstances of this case, answering Mr. Beasley's cellphone was not a search.

### 2. Mr. Beasley Abandoned the Cell Phone

Even if answering an incoming call were a search, Detective Maritz did not violate Mr. Beasley's constitutional rights in this case, because the cell phone was abandoned. "No Fourth Amendment 'seizure' occurs where the government appropriates abandoned property." *United States of America v. Mark Manigault*, No. 22-1922, 2024 WL 4298144, at *4 (3d Cir. Sept. 26, 2024) (quoting *Abel v. United States*, 362 U.S. 217, 241 (1960)). "'[I]f an item has been abandoned, neither the Fourth Amendment interest [in retaining possession of the item or in maintaining personal privacy of the information in the item] is implicated, and neither probable cause nor a warrant is necessary to justify seizure." *Manigault*, 2024 WL 4298144, at *4 (quoting *Texas v. Brown*, 460 U.S. 730, 748 (1983) (Stevens, J., concurring)). Whether an

individual has abandoned his property is a question of fact for the court to determine. *United States v. Minker*, 312 F.2d 632, 634 (3d Cir. 1962).

"Whether property is abandoned for Fourth Amendment purposes depends on 'the individual's reasonable expectation of privacy, not his property interest in the item.'" *Manigault*, 2024 WL 4298144, at *4 (quoting *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004)). An individual's reasonable expectation of privacy is determined "from an objective viewpoint." *Fulani*, 368 F.3d at 354. "To that end, outward manifestations of an individual's intent to abandon property are important for deciding whether he abandoned the property and had a reasonable expectation of privacy in that property." *Manigault*, 2024 WL 4298144, at *4 (citing *United States v. Moody*, 485 F.2d 531, 534 (3d Cir. 1973)). The Court conducts a "totality of the circumstances" inquiry that "focus[es] on whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure." *Id.* (citations omitted).

Considering the totality of circumstances presented in this case, the Court finds that Mr. Beasley abandoned his cell phone, along with his rental car, wallet, and identification. By running away from his rented Mustang, entering another vehicle, and driving off the Avis lot, Mr. Beasley abandoned his vehicle. *United States v. Lawrence*, No. CRIM 06-83, 2007 WL 925893, at *3 (E.D. Pa. Mar. 16, 2007) ("the Court concludes that an objective observer would agree that by running away from his vehicle, [the Defendant] abandoned it"). When Mr. Beasley fled from Detective Maritz, he also left behind his wallet and identification, items that, "from an objective viewpoint," are typically retained with an individual wherever they go. Thus, Mr. Beasley also abandoned his wallet and identification. After Mr. Beasley had been driven off the lot, Detective Maritz found the cell phone in Mr. Beasley's path of flight from the Mustang, and

Detective Maritz reasonably assumed it was Mr. Beasley's. Mr. Beasley did not return to the lot to retrieve the Mustang, his wallet, and identification, or his cell phone. Mr. Beasley also did not call his cell phone from another number or otherwise make any effort to claim his cell phone. Under these circumstances, the Court concludes that Mr. Beasley abounded his cell phone, the Mustang, his wallet and his identification. *See* United *States v. Small*, 944 F.3d 490, 503 (4th Cir. 2019) (upholding District Court's ruling that defendant, in fleeing to evade capture, had abandoned the vehicle he was driving, his cell phone, his shirt, and his hat); *see also United States v. Hanner*, No. 02 05 CR0385-02, 2007 WL 1437436, at *5 (W.D. Pa. May 14, 2007) (abandonment based on defendant telling associate that he had "dropped " his cell phone at the crime scene, stated he would retrieve it "later," but he never returned to retrieve the cell phone).

Viewing the totality of circumstances, the Court finds that Mr. Beasley abandoned his cell phone. Accordingly, Detective Maritz's legitimate possession of Mr. Beasley's cell phone at the time of the incoming calls, does not implicate Mr. Beasley's Fourth Amendment interests. *Brown*, 460 U.S. at 748. Consequently, Detective Maritz did not violate Mr. Beasley's constitutional rights by answering incoming calls to the cell phone.

### 3. Exigent Circumstances

Even if Mr. Beasley had not abandoned his cell phone, exigent circumstances existed, justifying Detective Maritz's conduct in answering incoming calls. An exception to the warrant requirement is when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Riley*, 573 U.S. at 402 (citations omitted). "Such exigencies could include the need to prevent the imminent destruction of evidence in individual cases, to pursue a fleeing suspect, and to assist persons who are seriously injured or are threatened with imminent injury." *Id.* "[T]he

exigent circumstances exception requires a court to examine whether an emergency justified a warrantless search in each particular case." *Id.* (citation omitted). When evaluating whether exigent circumstances exist, the Court considers the circumstances on a case-by-case basis and applies an objective test. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006); *Lange v. California*, 594 U.S. 295, 299 (2021) (whether fleeing misdemeanant qualifies as an exigent circumstance is to be determined on case-by-case basis). When exigent circumstances exist "the delay required to obtain a warrant would bring about 'some real immediate and serious consequences'—and so the absence of a warrant is excused." *Lange*, 594 U.S. at 302 (quoting *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984)).

      Here, the government argues that the need to locate and apprehend a fleeing suspect was the emergency situation permitting Detective Maritz to answer incoming calls. The Court agrees. The objective facts demonstrate exigent circumstances existed. Detective Maritz was reacting to rapidly developing circumstances in a compressed time frame. Detective Maritz had entered the Avis lot with the aim of determining whether the license plate of a vehicle on the lot matched the license plate of a stolen Jeep being sought by the Monroeville Police Department. He confirmed that it was the stolen Jeep. He uncovered his badge and, as he observed an individual close to the stolen Jeep's driver door, that person fled from Detective Maritz and jumped into the rented Mustang, in which Mr. Beasley sat in the driver's seat. He quickly found himself struggling with two individuals instead of just one, with Mr. Beasley breaking free, running away, and leaping into a moving car's window, which then sped off the Avis lot. Detective Maritz arrested Mr. Strothers and called for backup. He found the cell phone outside the Mustang. At that point, Detective Maritz had probable cause to believe that Mr. Beasley had "knowingly and intentionally fle[d] on foot from a public servant attempting to lawfully arrest or

detain that person, in violation of 18 Pa. C. S. A. § 5104.2 and that he, together with Mr. Strothers, was involved in stealing the Jeep. The need to locate, identify, and apprehend the fleeing suspect, under such circumstances, constitutes exigent circumstances, excusing the absence of a warrant to search the cell phone (and, for the same reasons, to search the Mustang without a warrant). By answering the incoming calls to the cell phone, Detective Maritz sought to identify the person who had just fled from him after committing a criminal act and who was also suspected of stealing a Jeep. Detective Maritz did not hide his identity when he answered the calls; he answered as himself, a law enforcement officer. Eventually he answered a call from someone who was able to provide him with a likely location where Mr. Beasley might be found. Had Detective Maritz waited for a warrant to answer the cell phone's incoming calls, it would have been too late. First, because, unlike a locked box in a house secured by law enforcement, it would be uncertain whether the person who provided the location information would have called back after a warrant was secured. Also. Mr. Beasley may not have been at 410 Bellwood Avenue by the time a warrant was secured. Thus, the need to identify, locate, and apprehend Mr. Beasley presented a "'compelling need for official action and no time to secure a warrant.'" *Lange*, 594 U.S. at 301 (quoting *Riley*, 573 U.S., at 402)). Therefore, the Court concludes that exigent circumstances also justified Detective Maritz's warrantless answering of incoming calls on Mr. Beasley's cell phone, such that, in addition to this Court's conclusion that such was not a search, and that the cell phone was abandoned, exigent circumstances also dictate that suppression of the evidence thereby obtained is not warranted.

### B. Initial Search of the Rental Car at Avis Lot

Following Mr. Beasley's flight, backup police officers arrived and Detective Maritz searched the Mustang. Therein he found Mr. Beasley's wallet in the closed center console area

and the key that Mr. Strothers dropped during their struggle. That key was the key to the stolen Jeep. Mr. Beasley argues that the items seized from the Mustang should be suppressed, because the search was performed without a warrant, without probable cause, and absent any exception to the warrant requirement. The defense argues:

> Other than Mr. Beasley's presence at the scene (and flight from the vehicle), at the time Maritz searches the vehicle, nothing about the vehicle suggested that it contained hidden contraband or evidence of a crime. Nevertheless, Maritz seized Mr. Beasley's personal property, including his wallet and identification card. Eventually, at the direction of Maritz, the vehicle was seized and towed to the Monroeville police station.

Def. Br. 15.

The Court's earlier discussion, regarding abandonment of property, leads to the conclusion that there was no Fourth Amendment violation in the initial search of the Mustang as it had been abandoned by Mr. Beasley. Likewise, the above discussion, regarding exigent circumstances, also leads to the conclusion that a warrant was not needed to search the Mustang, due to the emergent need to identify and locate Mr. Beasley, a fleeing suspect.

In addition, Detective Maritz had probable cause, and reasonable suspicion, to support a warrantless search of the Mustang. At the time he searched the Mustang, Detective Maritz had identified the stolen Jeep; he had apprehended the individual who had possessed the key to the stolen Jeep; that individual had fled and jumped into the Mustang where Mr. Beasley was sitting; and, although Detective Maritz told Mr. Beasley to "stop," Mr. Beasley ignored the command and fled. Based upon these facts, the Court finds: (1) that Detective Maritz had probable cause to believe that Mr. Beasley was violating a law. Specifically, Mr. Beasley had fled from Detective Maritz, in violation of 18 Pa. C. S. A. § 5104.2, and (2) that Detective Maritz

possessed specific, articulable facts to support his reasonable suspicion that Mr. Beasley had committed a crime connected to the stolen Jeep.[1]

Mr. Beasley, however, argues that each of his actions can be easily explained as innocent and lawful conduct. Reasonable suspicion must be evaluated under the totality of the circumstances; it "cannot be defeated by a so-called 'divide-and-conquer' analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each." *United States v. Green*, 897 F.3d 173, 183 (3d Cir. 2018) (quoting *D.C. v. Wesby*, 583 U.S. 48, 61 & 62 (2018)). Here, Detective Maritz relied on his training, experience, and his observations obtained during a compressed time period of frantic activity. The combination of observed facts, in light of detective Maritz's training and experience, reasonably lead him to conclude that Mr. Beasley was involved in criminal activity related to the stolen Jeep. Accordingly, the Court finds that Detective Maritz's search of the Mustang on the Avis lot did not violate the Constitution.

### C. Arrest of Mr. Beasley

Next, Mr. Beasley argues that law enforcement's warrantless arrest of him outside his home was unconstitutional. This argument is based upon Mr. Beasley's assertion that Detective Maritz, and the other Monroeville police officers present, lacked probable cause to arrest. As discussed above, Detective Maritz had probable cause to arrest Mr. Beasley when he fled from Detective Maritz, pursuant to 18 Pa. C. S. A. § 5104.2. In addition, Detective Maritz possessed information, discussed above, that supports a reasonable belief that Mr. Beasley was involved in

---

[1] It is not clear from the testimony if police officers searched the vehicle before or after law enforcement had found the AR-15 pistol and the bricks of heroin inside the stolen Jeep. Detective Maritz testified that, while still on the scene, another officer had observed the firearm and heroin in plain view through the Jeep's window, but it is not clear if Detective Maritiz knew that information before he searched the Mustang. The Court's ruling assumes that Detective Maritz did not know what was in the stolen Jeep before he searched the Mustang.

criminal activity connected to the stolen Jeep. In addition, by the time law enforcement arrived at 410 Bellwood Avenue, they had also discovered the AR-15 pistol and bricks of suspected heroin recovered from the stolen Jeep. Detective Maritz also knew that Mr. Beasley was a suspected member of HDS, a large-scale drug organization. Thus, law enforcement also had probable cause to believe that Mr. Beasley was involved in drug trafficking. Therefore, the Court concludes that the warrantless arrest of Mr. Beasley outside 410 Bellwood Avenue was based upon probable cause.

### D. Protective Sweep of 410 Bellwood

The Fourth Amendment protects the public from unreasonable searches and seizures. A warrantless search of a residence is presumed unreasonable, unless an exception applies to the circumstances of the search. *Horton v. California*, 496 U.S. 128, 133 (1990). One such exception to the warrant requirement is "a protective sweep of a home based upon reasonable suspicion that an individual posing a danger to law enforcement may be in the area searched." *United States v. Folks*, 452 F. Supp. 3d 238, 250 (W.D. Pa. 2020) (citing *United States v. White*, 748 F.3d 507, 511 (3d Cir. 2014); *Maryland v. Buie*, 494 U.S. 325, 344 (1990)). A warrantless, protective sweep of a residence is permitted where the sweep is "based on reasonable and articulable suspicion that the areas being searched may 'harbor [ ] an individual' who poses a danger to those present at the scene of the arrest." *White*, 748 F.3d at 511 (quoting *Buie*, 494 U.S. at 334). The Third Circuit Court explained that a warrantless protective sweep of a residence is permissible, because "'[i]t would be imprudent to prohibit officers who are effecting an arrest or waiting until a warrant may be obtained from ensuring their safety and minimizing the risk of gunfire or other attack coming from inside the home if they have reason to believe that dangerous individuals are inside.'" *Folks*, F.Supp.3d at 252 (quoting *White*, 748 F.3d at 511).

It is the government's burden to establish, by a preponderance of the evidence, that a warrantless protective search is within one of the recognized exceptions to the warrant requirement. *See United States v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992). "Any evidence obtained pursuant to a warrantless search that does not meet a recognized exception to the warrant requirement must be suppressed as 'fruit of the poisonous tree.'" *Folks*, 452 F.Supp.3d at 250 (citing *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citing *Wong*, 371 U.S. at 487-88 (1963)). Mr. Beasley argues that the government is unable to demonstrate a justification for conducting a warrantless search of 410 Bellwood Avenue after Mr. Beasley was arrested outside of the residence. The Court, however, finds that the protective sweep of the residence, after arresting Mr. Beasley, falls within the exception announced in *Buie*.

As recited above, law enforcement arrived at 410 Bellwood Avenue, knowing that Mr. Beasley had fled from the Avis lot, in violation of Pennsylvania law, and the officers also reasonably believed that Mr. Beasley and Mr. Strothers were involved in criminal activity related to the stolen Jeep. Law enforcement also suspected that Mr. Beasley was involved in drug trafficking, based upon the presence of suspected heroin and a firearm in the stolen Jeep, as well as Mr. Beasley's known association with members of the HDS drug trafficking organization. It was also known to the officers that members of the HDS drug trafficking organization possessed firearms. Furthermore, Mr. Beasley had $3,690 in United States currency on his person. This amount of cash is consistent with drug trafficking. Also, Mr. Beasley did not respond to the officers' questions as to whether anyone else was in the residence.[2] Finally, the woman, who

---

[2] Mr. Beasley was asked whether anyone else was inside the residence immediately after he was apprehended and was being told by an officer that he would be tasered if he did not comply. As the defense suggests, it is possible he did not hear the question, or he was unable to respond due to being physically restrained, but it is certain that the officers reasonably viewed his non-reply as a matter of concern for officer and public safety.

exited 410 Bellwood Avenue had no identification and was carrying a loaded firearm. The totality of circumstances clearly heightened the officers' concerns for safety regarding any potential other individuals inside the residence, supporting the legitimacy of the protective sweep

Based on the above information, the warrantless protective sweep of the residence was proper. Given the present and immediate likelihood of danger from inside the residence, the officers were not required to "wait[] until a warrant may be obtained" to ensure their safety and minimize the risk of an attack. *White*, 748 F.3d at 511. Law enforcement's protective sweep of the residence was "narrowly confined to a cursory visual inspection of those places in which a person may be hiding." *Buie*, 494 U.S. at 327.[3] While conducting the protective sweep, the officers observed a single firearm in plain view. The Court concludes that law enforcement possessed a reasonable and articulable suspicion that a dangerous individual may be inside 410 Bellwood Avenue, thus justifying the protective sweep of the residence.

## V.     Conclusion

For the reasons explained above, Defendant's Motion to Suppress Evidence (ECF No. 36) is DENIED.

Dated: October 22, 2024

Marilyn J. Horan
United States District Court Judge

---

[3] Detective Maritz testified that the "house was completely empty, not a chair or couch or nothing." Tr. 62.